410 Pa. 214 (1963)
Alabama Binder & Chemical Corporation
v.
Pennsylvania Industrial Chemical Corporation, Appellant.
Supreme Court of Pennsylvania.
Argued January 21, 1963.
March 19, 1963.
Before BELL, C.J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.
*215 Walter J. Blenko and Paul Kern Hirsch, with them Herbert B. Sachs, C. John Tillman, and Baskin, Sachs and Craig, and Hirsch, Truxall and Weise, for appellants.
Elliott W. Finkel, with him David Roth, Bernard Kaplan, and Kaplan, Finkel and Roth, for appellee.
OPINION BY MR. JUSTICE COHEN, March 19, 1963:
This is an appeal from an order of the court below granting a preliminary injunction to enforce a restrictive employment contract and to prevent the disclosure of trade secrets. In reviewing the grant or denial of a preliminary injunction our familiar rule is to examine the record only to determine "if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable." Lindenfelser v. Lindenfelser, 385 Pa. 342, 343-44, 123 A. 2d 626, 627 (1956). (Emphasis supplied). Summit Township v. Fennell, 392 Pa. 313, 140 A. 2d 789 (1958).
The issues before the court below are: (1) whether a restrictive employment covenant is reasonable under the facts of this case; (2) whether the complainant has standing to enforce this covenant, as well as a covenant not to disclose trade secrets, where the complainant was not a party to the original contracts; and (3) whether the agreement not to disclose trade secrets contravenes the policy of the patent laws. Keeping in *216 mind our narrow scope of review, we shall examine the factual context of the instant controversy.
Appellant, Calvin H. O'Brien (O'Brien) has been associated with the floor tile business for most of his adult life. In 1949, O'Brien and National Southern Products Corporation (National) organized the Alabama Binder & Chemical Corporation (Alabama).[1] This corporation was to be the sales corporation for plasticizers and binders which were to be manufactured by National.[2] Under the 1949 arrangement, O'Brien was named president of the newly formed corporation with National owning 50% of the stock of Alabama and O'Brien and his wife owning the other 50%. From the time Alabama was formed until his employment terminated, O'Brien was the entire sales department of Alabama, selling to the various national manufacturers of floor tile.[3] In addition to this sales function, O'Brien was instrumental in developing formulas for different types of binders and plasticizers manufactured by National.[4]
*217 This arrangement proved lucrative for all parties concerned. In June of 1957, O'Brien and his wife entered into two written agreements with Alabama. One of the agreements provided for the sale to Alabama of the stock owned by the O'Briens in return for a certain percentage of Alabama's gross profits to be computed over a five-year period in an amount not to exceed $500,000. This agreement also provided that all formulas and technical information in the possession of O'Brien and Alabama at the time of the agreement, and all formulas and technical information thereafter developed and acquired by O'Brien relating to the products sold through Alabama, should be the exclusive property of National. Pursuant to this agreement, the O'Briens earned the $500,000 maximum consideration over the five-year period.
In the other agreement,[5] bearing the same date as the "buy-sell" agreement, O'Brien entered into an employment contract with Alabama for a term of five years at a yearly salary of $15,000. This agreement contained a provision which stated that O'Brien was to refrain, during the term of his employment and for five years thereafter, "from at any time engaging in or taking any part or interest in, directly or indirectly, any business, occupation or pursuit that competes or conflicts with the business of Alabama or is contrary to its interests." The agreement further provided that *218 O'Brien was not to give or disclose any formulas or technical information to any competing company.
The relationship between O'Brien and National continued to be an amicable and profitable one, with O'Brien remaining as president of Alabama and performing the same duties. Before O'Brien had completed his five-year term of employment, National was involved in a series of mergers in January 1961, with Alabama finally merging into National and National changing its name to Alabama Binder & Chemical Corporation (New Alabama). O'Brien was made a vice-president of the new corporation and continued to work for and receive his salary and share of the profits from New Alabama in accordance with his agreement with its predecessor.
O'Brien's employment expired in June 1962 and he and New Alabama were unable to come to terms in their negotiations for a new contract. A month later O'Brien was employed by appellant, Pennsylvania Industrial Chemical Corporation (PICCO), a Pennsylvania corporation which was a competitor of New Alabama in the field of binders and plasticizers, which employed O'Brien with knowledge of the restrictive provisions contained in the aforementioned agreements.
On learning of O'Brien's new employment, appellee-New Alabama brought a complaint in equity praying for an injunction to enjoin O'Brien from continuing in the employ of PICCO and to prevent him from disclosing any secret processes and formulas protected under the 1957 agreements. New Alabama also seeks an accounting for any profits resulting from the alleged misconduct of appellants O'Brien and PICCO. After hearing voluminous testimony,[6] the court below issued a temporary injunction pending a final hearing.
*219 For the purposes of granting the temporary injunction, the court below held that the five-year restriction in the contract was reasonable as to time and space. In regard to the geographical breadth of the covenant, the lower court stated that the market for binders and plasticizers sold by both Alabama and PICCO was confined to a limited number of floor-tile manufacturers[7] having offices throughout the United States and it was therefore reasonable and proper to insert a restriction covering the territorial United States. As to the time of the restriction, the court again felt that under all the circumstances this provision was not unreasonable.
With respect to the disclosure of trade secrets, the court stated that "`[w]here confidence is reposed, and the employee by reason of the confidential relationship has acquired knowledge of trade secrets, he will not be permitted to make disclosures of those secrets to others to the prejudice of his employer.'"
And finally, the court held that New Alabama had standing to enforce these agreements despite appellants' contention that these agreements were non-assignable personal service contracts. It cited several cases supporting the proposition that "restrictive covenants not to compete are just as assignable as any other asset of the employer's business." Moreover, it held that even in the absence of assignability, New Alabama has standing to enforce the contract since O'Brien had ratified the assignment of his contract when he knowingly continued to work for the new corporation under the same contract he had with the old corporation.
Without passing judgment on the merits of these questions, we conclude that under the standard of review set forth in Lindenfelser v. Lindenfelser, supra, the court below had apparently reasonable grounds for its action, especially in view of the fact that the restrictive *220 covenant was made in conjunction with a buysell agreement.[8] As we have traditionally held, covenants not to compete which are ancillary to a buy-sell agreement will not be subject to as stringent a test of reasonableness as that applied to employment contracts. See Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 632, 136 A. 2d 838, 846 (1957).
Appellants also maintain that the aforesaid covenant of nondisclosure is void because it contravenes the patent laws of the United States, citing Scott Paper Company v. Marcalus Company, 326 U.S. 249 (1945) to support their position. At this stage of the proceedings it suffices to say that the Scott case seems clearly distinguishable and it is for the lower court at the final hearing to definitively rule on this issue.
Aside from the merits, we also conclude that the decree of the court below satisfied the essential prerequisites for the issuance of a preliminary injunction.
First, the issuance of a preliminary injunction was necessary to prevent immediate and irreparable harm which could not be compensated by damages. Herman v. Dixon, 393 Pa. 33, 141 A. 2d 576 (1958). O'Brien was in a position to pass on to a competing company secret formulas which he had acquired while in the employ of Alabama and its successor and there is evidence in the record indicating that O'Brien was asked about these formulas by officials of PICCO. In addition, the fact that New Alabama and PICCO sold to the same limited group of customers who were previously serviced by O'Brien placed O'Brien in the position to draw customers away from appellee and perhaps transfer them to his new employer. Not only is *221 there an immediate threat of injury but such injury would also be irreparable since it would be difficult, if not impossible, to ascertain the damages inflicted upon appellee. See Philadelphia Ball Club, Limited v. Lajoie, 202 Pa. 210, 216, 51 Atl. 973, 974 (1902); Stuart v. Gimbel Brothers, Inc., 285 Pa. 102, 108-09, 131 Atl. 728, 730 (1926).
Second, greater injury would result by refusing the preliminary injunction than by granting it. See Perloff Brothers, Inc. v. Cardonick, 406 Pa. 137, 176 A. 2d 413 (1962). In comparison to the immediate and irreparable harm that appellee is subjected to, O'Brien would suffer no serious injury. At worst, he will be deprived of his salary from PICCO, which may be compensated by damages in the event it appears at final hearing that the injunction was improvidently granted.
As to the effect of the injunction on appellant PICCO, the degree of injury imposed on it would be far less than the injury which would be sustained by appellee if the injunction had not been granted. Since O'Brien is still a new employee of PICCO and has not become indispensable, PICCO can obtain a replacement for him. Moreover with respect to the trade secrets, once they are fully disclosed no order can possibly restore their secrecy, whereas, if after the final hearing it is determined that PICCO may have access to this information, then the only harm which PICCO will suffer is the short delay that takes place until the final hearing.
And third, until a final determination can be made, the decree properly restores the parties to their status as it existed immediately prior to the allegedly wrongful conduct. See Pennsylvania Public Utility Commission v. Israel, 356 Pa. 400, 407-08, 52 A. 2d 317, 321 (1947).
Decree affirmed at appellants' costs.
NOTES
[1] Alabama was a Delaware corporation having its principal sales office in Alabama.
[2] A floor tile consists of finely-divided mineral fillers such as limestone and asbestos, held together in sheet-like foam by a binder. Asphalt was originally employed but resins have come to be more widely used because lighter colored tiles can thereby be made. The resins employed are brittle and a plasticizer is therefore incorporated in the mix so that the floor tiles will have the desired physical properties.
[3] He personally conducted relations with customers, controlled pricing to customers, and handled all customer calls relating to any problems that developed.
[4] In pursuing his sales efforts, O'Brien and his customers would discuss and determine specifications for the manufactured products. The process by which the plasticizer or resin or binder would be made to meet these specifications would then be developed by O'Brien through laboratory work, then plant trial samples, and finally in actual commercial plant production  all in secrecy and under the direction of O'Brien. He would direct the process for turning out the finished product, determine the temperatures, pressures, and the sequence of adding ingredients. This process of "know-how" was known by O'Brien but was not known by the customers.
[5] These agreements were drafted by counsel for National, sent to the O'Briens in New Jersey for their signature, and then sent to Massachusetts where they were signed on behalf of Alabama. Since this is a multi-state transaction, in the event of a conflict of laws, the court below should at the final hearing determine and apply the law of the state which governs this contract dispute.
[6] The record is over 590 pages. The trial judge asked the parties to stipulate that the hearing be considered the final hearing but the parties refused.
[7] These manufacturers are the Kentile, Congoleum Nairn, Johns-Manville, Armstrong Cork, Bonafide, and Tile Tex companies.
[8] Testimony was adduced at the hearing below disclosing that the reason why such a favorable price was paid for the O'Brien's stock under the buy-sell agreement was because O'Brien had agreed to work for Alabama for five years and not to work for Alabama's competitors for five years after the termination of his employment.