## Corporate Lodgings of Pennsylvania Inc.
## v. Chenot

*John G. Shorall II,* for plaintiff.
*Robert V. Campedel,* for defendant.

ORIE MELVIN, *J.,* July 2, 1996—Plaintiff Corporate Lodgings of Pennsylvania Inc., commenced this civil action by filing a complaint against defendant Christine Chenot. Plaintiff was seeking an injunction to prevent Chenot from competing with her former employer Corporate Lodgings. After testimony, oral argument and written briefs, this court entered an order denying preliminary injunctive relief. It is from this order that the defendant appeals to the Superior Court of Pennsylvania.

The relevant facts established through testimony and stipulation are as follows. In March 1994, plaintiff's President Rocco DiLillo and Vice President Diane Ayres actively recruited defendant Chenot to work for Corporate Lodgings in Pennsylvania. At that time, defendant

Chenot was employed by a company named Zaremba as the resident manager and rejected this first opportunity to interview with Corporate Lodgings. However, after subsequent effort by Corporate Lodgings, Chenot accepted an offer from Corporate Lodgings. From the start of Chenot's employment at Corporate Lodgings until she resigned, she received excellent job evaluations and had substantially increased the gross sales in the Pittsburgh office. Throughout Chenot's employment at Corporate Lodgings, she had discussions with DiLillo about promotions and advancement to a regional management position or supervisory training position. Evidence of these promises is contained in the letter dated April 21, 1995 from DiLillo to Chenot (admitted into evidence as defendant's exhibit C).

Due to the breach of these promises and the offer of employment at Limited Editions, a Canadian publishing company, Chenot tendered her resignation to Corporate Lodgings in a letter dated June 7, 1995. Corporate Lodgings, specifically DiLillo and Ayres, immediately responded to Chenot's resignation letter of June 7, 1995, and pending job offer from Limited Editions by contacting Chenot to persuade her to stay at Corporate Lodgings. DiLillo made specific promises of advancement and promotion to Chenot to persuade her to stay at Corporate Lodgings and reject the offer from Limited Editions. Specifically, DiLillo promised to promote Chenot to a regional manager position and have her train the Milwaukee office staff and supervise its activities from Pittsburgh. Based on these promises, Chenot rejected the pending employment offer from Limited Editions at a salary of approximately $60,000 and continued to work at Corporate Lodgings.

On or about mid-September 1995, due to the broken promises, misrepresentations and bad faith on the part of DiLillo and Corporate Lodgings, Chenot resigned again. Subsequent to Chenot tendering her resignation

in September 1995, she learned that DiLillo and Ayres were recruiting someone else for the regional manager position that had been promised to her. On or about October 28, 1995, Corporate Lodgings hired Thomas Cirner as the general manager in the Pittsburgh office with the expectation that he would be promoted to vice president in the Cleveland office of Corporate Lodgings.

After resigning from Corporate Lodgings, Chenot relocated to her brother's home in Birmingham, Alabama. During her stay in Alabama, Chenot searched for a career that would utilize her skills and aptitude. However, Chenot was unable to find suitable employment and remained unemployed for a period of approximately two months. Finally, Delta Corporate Suites, a division of Delta Furniture Inc., contacted Chenot about the available position of general manager at Delta Corporate Suites.

Delta Corporate Suites, which had been developing the idea for approximately two years, had decided to enter the short-term living market prior to talking with Chenot. Delta Corporate Suites provides temporary corporate housing on a 30-day minimum stay basis, comparatively different than the three-day minimum stay for Corporate Lodgings. Delta hired Chenot for the position of general manager and she is currently employed in that position.

In seeking this injunction, plaintiff alleges that Chenot not only stole confidential information of Corporate Lodgings but also stole customers from Corporate Lodgings. To support this claim, plaintiff presented undisputed evidence through plaintiff's exhibits one through 11 of the complaint in equity. However, this court finds that this information is generally known to the public, is not unique, is typically used in general form by many businesses and was not specifically being used by Chenot. Further, Corporate Lodgings did not produce any evidence that Chenot physically took any of the pur-

ported confidential and proprietary information, nor did Corporate Lodgings produce any evidence that Chenot has used any of the confidential information. Although Chenot did receive informal and formal training by Corporate Lodgings most, if not all of the training was based on common sense and related to general sales tactics and procedures.

As to the allegation that Chenot stole customers from Corporate Lodgings, the uncontested testimony of the president of Delta Furniture, Bill Eggert, was that all of the four corporations allegedly contacted by Chenot were former and current clients of Delta Furniture. Delta Furniture's customer lists were compiled years before Chenot began working for Delta Corporate Suites. Furthermore, the four corporations (Westinghouse, American Eagle, ALCOA and Robocom) are all contained in customer lists of Delta Furniture and Delta Corporate Suites. Only one of these four corporations was a former customer of Corporate Lodgings and currently a customer of Delta Corporate Suites. That one customer was Mr. Robert Bell from Robocom Inc. The relationship between Robocom and Delta Corporate Suites was initiated by Mr. Robert Bell. Robocom had been a customer of Delta Furniture for several years prior to Chenot working at Delta Corporate Suites.

This court finds that Delta Corporate Suites has no agreement with Corporate Lodgings and both parties are free to do business in the short-term furnished housing market in the Pittsburgh area. Delta Corporate Suites will continue to do business in the market regardless of whether or not Christine Chenot is employed by Delta Corporate Suites. Delta Corporate Suites has access to hundreds of customers of Delta Furniture, whom Delta Furniture has serviced in the furniture rental business and corporate relocation business.

It is well settled in the law that the granting of preliminary injunctive relief is an extraordinary remedy

which should be granted only in exceptional circumstances and the court should exercise its power to grant injunctive relief with great caution. A preliminary injunction should be granted if the moving party's right is clear and the wrong is manifest. *Albee Homes Inc. v. Caddie Homes Inc.,* 417 Pa. 177, 207 A.2d 763 (1965). The moving party has the burden of proving that it is necessary to prevent the immediate and irreparable harm, that greater injury will result by refusing the injunction than by granting it, and that the injunction properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct. *Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp.,* 410 Pa. 214, 189 A.2d 180 (1963).

In the present case, plaintiff is seeking an injunction to prevent defendant Chenot from working for Delta Furniture, or any employer, which competes with Corporate Lodgings. Plaintiff seeks to enforce the restrictive covenant contained in their employment agreement with Chenot. The law in Pennsylvania provides that such restrictive convenants are valid and enforceable if the covenant is reasonably limited in duration of time and geographic extent; or reasonably necessary to protect the employer without imposing any undue hardship on the employee; or ancillary to an employment relationship; or supported by consideration. [See *George W. Kistler Inc. v. O'Brien,* 464 Pa. 475, 480, 347 A.2d 311, 314 (1975).] The trial court determines the reasonableness of a covenant by balancing the employer's interest in preventing unfair competition with the interest of the former employee in pursuing her livelihood. In considering whether it is necessary to protect the employer's interests by enforcing a restrictive convenant, the court analyzes the impact that the enforcement of the restrictive covenant will have on all the parties

to the covenant. *Wainwright's Travel Service Inc. v. Schmolk,* 347 Pa. Super. 199, 500 A.2d 476 (1985). The interest protected by enforcement of the covenant in this case must be viewed in conjunction with the hardship which Chenot will suffer as a result of such enforcement.

Upon a balance of hardships, the potential hardship faced by Chenot will be far greater than any interest which Corporate Lodgings seeks to protect in that the harm to Corporate Lodgings appears to be minimal and the harm to Chenot in losing her livelihood is great. Since Chenot's interest in pursuing her livelihood far outweighs Corporate Lodgings' risk of unfair competition, plaintiff has not sustained its burden of proving that a preliminary injunction is equitable.

The basis for Corporate Lodgings' claim of unfair competition is that Chenot is sharing "trade secrets" and confidential information she obtained while employed at Corporate Lodgings with her new employer Delta, to Corporate Lodgings' unfair disadvantage. However, to be entitled to an injunction against use or disclosure of information, under Pennsylvania law, the defendant must show: (1) that the information constitutes a trade secret; (2) that it was of value to the defendant and important in the conduct of its business; (3) that by reason of discovery or ownership, defendant had the exclusive right to the use and enjoyment of the secret; and (4) that the secret was communicated to plaintiff while in a position of trust and confidence under such circumstances as to make it inequitable and unjust for plaintiff to disclose it to others, or to make use of it herself, to the prejudice of defendant. Corporate Lodgings thus, has the burden of showing a legally protectable trade secret and that the defendant has misappropriated the secret. In determining whether the information alleged by Corporate Lodgings constitutes

a trade secret, the court must consider such factors as: (1) the extent to which the information is known outside of defendant's business; (2) the extent to which the information is known by employees and others involved in defendant's business; (3) the extent of measures taken by defendant to guard the secrecy of the information; (4) the value of the information to defendant and to its competitors; (5) the amount of effort or money expended by defendant in developing the information; and (6) the ease or difficulty with which the information properly could be acquired or duplicated by others.

Applying these rules of law, the issuance of an injunction in this case is not warranted because the information Chenot took with her to her new employer does not qualify as "trade secrets" nor is it information that is entitled to such protection. While client lists are valuable to Corporate Lodgings, these lists and personal contacts to customers were compiled by Chenot and not gained through any confidential sources. They were in effect the recorded results of Chenot's experience and work to meet the needs of her customers' requests. Chenot's contact with corporations that needed housing for corporate visitors resulted in her finding out for herself the contact people with each corporation. Such information is available to anyone working in the industry developing professional contacts.

An injunction in this case is not reasonably necessary for Corporate Lodgings' protection from competition by Chenot because she only took with her from her job at Corporate Lodgings her experience and general knowledge of the field of business. This court cannot grant plaintiff's request for an injunction since there is no evidence to support Corporate Lodgings' claim that Chenot is in possession of confidential and pro-

prietary information. Furthermore, Corporate Lodgings is not entitled to injunctive relief based on potential competition with Chenot's new employer Delta. Delta entered the temporary housing market prior to hiring Chenot and will continue to do business in the temporary housing market with or without Chenot.

This court finds that Christine Chenot is entitled to take with her the experience, knowledge, memory, and skill which were gained during the course of her employment with Corporate Lodgings. The customer information and lists compiled by Chenot were not gained through any confidential sources; rather the information that Chenot compiled during the course of her employment with Corporate Lodgings was for the purpose of meeting customer requests and solving customer problems and was nothing more than the recorded results of Chenot's acquisition of general knowledge and skill in the field, not protectable trade secrets.

Since the customer relationships were actually developed and preserved by Chenot and the Corporate Lodgings customer listings are easily discoverable by any employee doing a job similar to Chenot, these customer lists are publicly available and are not particular secrets of Corporate Lodgings entitled to protection. Corporate Lodgings' claim is confidential and proprietary information is not entitled to court-imposed protection.

Preliminarily enjoining Chenot from working for Delta Corporate Suites will neither protect Corporate Lodgings from competition by Delta, nor will it protect Corporate Lodgings from Chenot's use of confidential and proprietary information of Corporate Lodgings since there is no evidence that Chenot is in possession of, or is using such information. Enjoining Chenot from pursuing her career will cause her great financial hardship. Based on the foregoing facts and law, this court properly denied the plaintiff's request for injunctive relief.