## Nagaraj v. Arcilla

*Gary A. Rochesti,* for plaintiff.
*Donald M. Bowman,* for defendant.

BIESTER, *J.,* June 29, 1981—This is a case in which a physician who employed another physician is seeking to enforce by preliminary and permanent injunction a covenant not to compete. At issue at the present time is whether a preliminary injunction should be ordered.

## FINDINGS OF FACT

1. Plaintiff, C. V. Nagaraj, M.D., is a physician licensed to practice medicine in the Commonwealth of Pennsylvania and state of New Jersey.

2. In January of 1980, Dr. Nagaraj, for the consideration of $105,000, purchased from a Dr. Pearson the Croydon Medical Center, which consisted of the real estate located at 801 State Road, Croydon, Pennsylvania, and the furniture, fixtures and equipment contained therein, and all of Dr. Pearson's patient records and goodwill, as well as the right to utilize the name "Croydon Medical Center."

3. After purchasing the Croydon Medical Center from Dr. Pearson, Dr. Nagaraj spent $35,000 for renovations, the purchase of additional equipment, and the maintenance and operation of the Croydon Medical Center.

4. Defendant, Anastasia Ferguson a/k/a Stacey Ferguson, was the office manager for Dr. Pearson and when Dr. Nagaraj purchased the Croydon Medical Center she agreed to work for Dr. Nagaraj for approximately two months for the purpose of training Dr. Nagaraj's staff. However, she ultimately remained with Dr. Nagaraj as the office manager/administrator of the Croydon Medical Center until February 27, 1981, at which time she resigned.

5. At the time Dr. Nagaraj purchased the Croydon Medical Center from Dr. Pearson it was his intention to hire a doctor to run the Croydon Medical Center. To that end, in February or March of 1980, he hired a Dr. Niak, who worked on a part-time basis. Upon termination of that relationship in May or June, 1980, Dr. Nagaraj hired Dr. B. B. Franklin on a part-time basis.

6. In July 1980, Dr. Nagaraj and Dr. B. B.

Franklin orally agreed that beginning August 1, 1980, Dr. B. B. Franklin would work full-time for Dr. Nagaraj at the Croydon Medical Center under the terms and conditions which were eventually reduced to a written agreement, which was executed by Dr. Nagaraj and Dr. B. B. Franklin on August 15, 1980 and witnessed on that date by Stacey Ferguson.

7. Dr. B. B. Franklin, when he began his employment with Dr. Nagaraj, in May of 1980, did not have his own private practice of medicine, and other than a few patients, all patients Dr. B. B. Franklin treated at the Croydon Medical Center, he saw for the first time at that center.

8. Other than approximately one night per week, at which time Dr. Nagaraj would see on the average five to six patients at the Croydon Medical Center Dr. B. B. Franklin was the only doctor at that center and he saw all the other patients.

9. Dr. Nagaraj, in an effort to enhance Dr. B. B. Franklin's ability to treat patients of the Croydon Medical Center, wrote a letter of recommendation to the Lower Bucks County Hospital in support of Dr. B. B. Franklin's application for privileges there.

10. From August, 1980 to early March, 1981, the number of patients seen at the Croydon Medical Center steadily increased. Then, as a result of the actions of Dr. B. B. Franklin and Mrs. Ferguson, as set forth hereafter, there was a sharp decline in the number of patients and a concomitant drop in the income of the Croydon Medical Center, which condition continues to date.

11. Notwithstanding the increase of patients and income from August, 1980 to early March, 1981, the Croydon Medical Center always operated at a loss, which loss was made up by Dr. Nagaraj and his wife from their personal funds.

12. On February 15 or 16, 1981, Mrs. Ferguson, notwithstanding the fact that she was still an employe of Dr. Nagaraj at the Croydon Medical Center for which she was being compensated, began to work at the State Road Medical Center, which is located at 705 State Road, Croydon, Pa., approximately one block from the Croydon Medical Center.

13. The owners of the State Road Medical Center/State Road Medical Associates are Dr. B. B. Franklin and Mrs. Ferguson, and apparently a Dr. Giriwanlal Gupta, who did not appear at the hearing on the preliminary injunction.

14. On February 9, 1981, Dr. B. B. Franklin, without advising Dr. Nagaraj, opened a post office box, the effect of which was and is that all mail addressed to the Croydon Medical Center, 801 State Road, Croydon, Pa., which has Dr. B. B. Franklin's name on the envelope, in any capacity, was and is being rerouted to his post office box as of February 18, 1981.

15. As a result of Dr. B. B. Franklin's post office box, Dr. Nagaraj and the Croydon Medical Center have not and will not receive payments from various insurance companies for services rendered by Dr. B. B. Franklin to patients of the Croydon Medical Center during his employment there. Nor did the Croydon Medical Center receive any mail concerning these patients.

16. In February, 1981 Dr. B. B. Franklin agreed, without advising Dr. Nagaraj, to work at the State Road Medical Center. Beginning March 16, 1981, he began to see patients at the State Road Medical Center, notwithstanding the fact that he was still employed and compensated by Dr. Nagaraj at the Croydon Medical Center.

17. In late February, 1981, Mrs. Ferguson contacted Richard Stupak, the medical sales repre-

sentative for the Mead Johnson Pharmaceutical Company in Lower Bucks County and ordered one thousand (1,000) announcements for "Dr. B. B. Franklin and Associates" at the State Road Medical Center. She sent those announcements, in March, 1981, to patients of the Croydon Medical Center.

18. On March 19 and 20, 1981 an advertisement prepared in part by Dr. B. B. Franklin announcing the opening of the State Road Medical Center appeared in the Bucks County Courier Times, which is circulated throughout Bucks County.

19. Shortly before March 23, 1981, patients of Dr. Nagaraj showed him the announcement and the advertisements which appeared in the Bucks County Courier Times and on March 23, 1981, Dr. Nagaraj fired Dr. B. B. Franklin.

20. The actions of Dr. B. B. Franklin in practicing medicine at the State Road Medical Center constitute a violation of his agreement with Dr. Nagaraj and in particular, the restrictive covenant contained therein, which prohibits Dr. B. B. Franklin from practicing medicine within ten (10) miles of the Croydon Medical Center for a period of five years from the date the agreement was terminated.

21. Shortly after March 23, 1981, Dr. Nagaraj received one hundred requests for the transfer of medical records for patients of the Croydon Medical Center which were to be forwarded to the State Road Medical Center. All of the requests were prepared and sent by Mrs. Ferguson, some being executed as early as March 16, 1981.

22. Notwithstanding the various names of the doctors which appeared in the advertisement in the Bucks County Courier Times on March 19 and 20, 1981 the only doctor who has been and is continu-

ing to practice medicine at the State Road Medical Center is Dr. B. B. Franklin.

23. Of the three hundred eighty-nine patient visits at the State Road Medical Center between March 16, 1981, the date it opened, and the date of the hearing on the preliminary injunction, April 23, 1981, a maximum of 52 of those visits were by patients not previously patients of the Croydon Medicat Center.

24. As a result of the actions of Dr. B. B. Franklin and Mrs. Ferguson as aforesaid, Dr. Nagaraj and the Croydon Medical Center have suffered and will continue to suffer a severe loss of patients and a concomitant loss of income, along with a loss of goodwill and reputation in the community.

25. Within a ten-mile radius of the Croydon Medical Center a substantial number of physicians engaged in family practice, internal medicine, obstetricians and urologists numbering perhaps a 100 have active offices.

26. Enforcement of the restrictive covenant contained in the agreement between Dr. Nagaraj and Dr. B. B. Franklin would not adversely affect the community in that there are more than a sufficient number of qualified doctors in the relevant area.

27. Plaintiff failed and refused to pay Dr. B. B. Franklin for his services during the month of February, 1981 and for the 23 day period of March of 1981.

28. The testimony and evidence established that defendant Dr. B. B. Franklin was a very caring and conscientious physician and was well thought of by his patients and by the staff with whom he worked.

The oral agreement entered into by Drs. Nagaraj and Franklin was comprehensively memorialized

and formally executed by the written agreement "P-1" and this occurred on August 15, 1980.

Paragraph six of "P-1" provides as follows:

"In consideration of the above Dr. Benjamin Franklin agrees not to open a medical practice within a ten-mile radius of Croydon Medical Center for the terms of this agreement plus five years."

## DISCUSSION AND CONCLUSIONS OF LAW

As we noted at the close of the hearings this case will probably determine whether any reasonable restrictive covenant limiting the practicing of physicians contrary to such covenants will remain enforceable in Pennsylvania because it is very difficult to imagine a case which isolates the question of public policy as clearly as this one does.

The case presents a situation in which a physician was hired by another physician to practice medicine in the hiring physician's office. The employe-physician began to go to work and became well regarded by the patients and the staff with whom he worked.

The employe-physician determined, apparently, to open up a different practice arrangement and chose to do so in a location about one block away from his employer's office. Not only did he establish the new operation but virtually the entire staff of the employing physician's office wound up very shortly in the new arrangement a block away. Additionally, defendant, Dr. B. B. Franklin, without notice to his employer, diverted moneys, which under the contract were due and owing to his employer, to come directly to Dr. Franklin through the renting of a mail box at the Bensalem Post Office which contained his name. The employe-physician withheld those moneys from his employer until the close of the hearings on this case.

In opposition to the granting of the preliminary injunction the defense raises certain propositions of law:

1. That the employment contract did not preclude defendant B. B. Franklin, M.D., from practicing medicine as an *employe* of another and such practice in the *employ* of another physician would not violate the provision in the employment contract prohibiting Dr. Franklin from "open[ing] a medical practice."

2. That there was no consideration for the restrictive covenant.

3. That plaintiff did not come with clean hands into the case.

4. That public policy considerations require under all the circumstances of this case the court to refuse to grant equitable relief to a restrictive covenant.

We will treat the several propositions seriatim.

The language of the restrictive covenant provides as follows:

"In consideration of the above, Dr. Benjamin Franklin agrees not to open a medical practice within a ten-mile radius of Croydon Medical Center for the terms of this agreement plus five years."

We have no difficulty in determining that the phrase "open[ing] a medical practice" includes becoming a doctor in the employ of a medical center or another physician. One practices medicine when one serves patients as a physician. The phrase is clear and the arrangement of medical practice of defendant Dr. B. B. Franklin is well within its interdiction.

The second question is whether the restrictive covenant is supported by consideration. The essential thrust of the defense position with respect to lack of consideration apparently is that because Dr.

Franklin was employed on a part-time basis prior to his being employed on a full-time basis pursuant to the terms of the employment contract in question here that there was no consideration therefore for the restrictive covenant.

The difficulty with defendant's position is that the employment contract was entered into on or about the 1st of August 1980 and was entered into pursuant to a *new* employment arrangement between plaintiff and Dr. B. B. Franklin which expanded Dr. Franklin's duties and responsibilities and provided for additional benefits to Dr. Franklin. While defendant is correct that continued employment is not sufficient consideration to support a covenant not to compete, a change in the form of an initial employment contract or a change in the conditions of existing employment may constitute sufficient consideration and in this case we find that they do: Capital Bakers, Inc. v. Townsend, 426 Pa. 188, 231 A. 2d 292 (1967), and Maintenance Specialities v. Gottus, 455 Pa. 327, 314 A. 2d 279 (1974).

The defense further contends that the original oral contract between Dr. Franklin and Dr. Nagaraj entered into about the 1st of August of 1980 did not contain the restrictive covenant and that that provision only became a part of an employment contract when the written instrument Exhibit "P-1" was executed on August 15. We believe that that contention fails for two reasons. First it was plaintiff's testimony and we have found as a matter of fact that the oral agreement contained all of the provisions which are recited in the written contract executed two weeks later. Secondly, even if that were not the case we find that the written agreement "P-1" was ancillary to the taking of employment in that it was executed within

two weeks of the taking of employment. The court in Capital Bakers, supra, by a footnote referred to and adopted Black's Law Dictionary definition of ancillary as "[a]iding; attendant upon; . . . [a]uxiliary or subordinate." We find that a written agreement executed within two weeks of employment is an agreement which is ancillary to it and is attendant upon, auxiliary or subordinate to that taking of employment.

The third defense is the allegation that plaintiff does not come to equity with clean hands in that defendant alleges that Dr. Nagaraj suggested that patients be given more treatment than was indicated and that the staff use their best efforts to increase the income of the Croydon Medical Center without regard to the needs of the patients. Defendant alleges that plaintiff saw the practice of medicine merely as a business and not as a profession.

We do not believe that those allegations bear upon the issue at hand. First we have made no finding of fact with respect to them and in fact no supporting evidence was offered with respect to them other than the testimony of Stacey Ferguson and Dr. Franklin. We therefore do not find that plaintiff comes to equity with unclean hands. It is interesting to note on this subject that throughout the proceedings Dr. Franklin portrayed himself as one concerned only about the treatment of patients and unconcerned about business matters and portrayed Dr. Nagaraj on the other hand as overly concerned with commercial and business aspects of medicine. It is ironic under the circumstances that Dr. Franklin despite his protestations is the one who surreptitiously began to make arrangements for employment in a new medical office to be located about a block away from his employer's of-

fice and that it was Dr. Franklin who devised the means by which he could surreptitiously divert checks in payment for services which should have gone to Dr. Nagaraj's office to in fact, Dr. Franklin's personal post office box and it was Dr. Franklin who withheld those checks from Dr. Nagaraj for an extended period of time.

We now come to the matter which is the more serious of the problems in this case and that is the question of impact of public policy considerations upon enforcement of the restrictive covenant in this case.

The Supreme Court in a plurality opinion in the case of New Castle Orthopedic Associates v. Burns, 481 Pa. 460, 392 A. 2d 1383 (1978), addressed in the following terms, at p. 468, the concerns of the court with respect to the issue of enforcing restrictive covenants when medical practice is at issue:

"One of the factors to be considered in reviewing the issuance of an injunction enforcing an anticompetitive employment covenant is the effect of the action upon the interests of society as a whole. Consequently, when the courts of other jurisdictions have been presented with this question, their analysis has focused upon the number of practitioners in the area involved. In Odess v. Taylor, 282 Ala. 389, 211 So. 805 (1968), for example, because of a shortage of ear, nose, and throat specialists in the area, the court held that it would be adverse to the public interest to enjoin the defendant physician from practicing this specialty in the area mentioned in the covenant not to compete in his employment contract. In the following cases, the courts upheld and enforced the restrictive covenants because there was a *sufficiency of physicians already practicing in the area:* Middlesex Neurological Associates, Inc. v. Cohen, 3 Mass.

App. 127, 324 N.E. 2d 911 (1975) (neurosurgeon enjoined from practicing his specialty where area did not appear to need additional neurologist); Horne v. Radiological Health Services, 83 Misc. 2d 446, 371 N.Y.S. 2d 948 (1975) (covenant not to compete enforced where there appeared to be sufficient radiologists in the county and there appeared to be no adverse impact on the public); Cogley Clinic v. Martini, 253 Iowa 541, 112 N.W. 2d 678 (1962) [(]covenant not to compete enforced against orthopedic surgeon where there were over 460 physicians, including many specializing in orthopedic surgery, in the area within the covenant); Foltz v. Struxness, 168 Kan. 714, 215 P. 2d 133 (1950) (where there was a recent influx of ten additional physicians into the city covered by the covenant not to compete); Wilson v. Gamble, 180 Miss. 499, 177 So. 363 (1937) (covenant enforced against physician where the number of physicians in the city was sufficient for the rendition of medical services to the citizens thereof and its vicinity).

"In an era where the availability of and the rising cost of medical services are matters of national concern, the law must consider the impact of the enforcement of these noncompetitive clauses upon the problem. Paramount to the respective rights of the parties to the covenant must be its effect upon the consumer who is in need of the service. This is of particular significance where equitable relief is being sought and the result of such an order or decree would deprive the community involved of a desperately needed service." (Emphasis in original.)

As the Supreme Court has noted one of our concerns must be the accessibility to the relevant patient community of medical services of the kind practiced by Dr. Franklin. We believe that after

very careful consideration of the testimony that the patient community within the radius of the area covered by the restrictive covenant is sufficiently served by doctors practicing in fields practiced by Dr. Franklin so that this preliminary injunction would not have an adverse impact upon that patient community. As chancellor if I thought for one moment that the preliminary injunction would have such an adverse effect I would not issue it.

The testimony of Mr. Stupak who was the sales representative for a pharmaceutical company and presumably an unbiased witness indicates and we have found as a matter of fact in finding of fact no. 25, a substantial number of physicians are engaged in family practice, internal medicine, obstetrics, and urology, numbering as many as a hundred with active offices within a ten-mile radius of the Croydon Medical Center. We also have made a finding of fact no. 26 that enforcement of the restrictive covenant would not adversely affect the community in that there are more than a sufficient number of qualified doctors in the relevant area.

As the Supreme Court said in Herman v. Dixon, 393 Pa. 33, 36, 141 A. 2d 576 (1958), ". . . preliminary injunction is somewhat like a judgment and execution before trial, [and] it will only issue where there is an urgent necessity to avoid injury which cannot be compensated for by damages and should never be awarded except when the rights of the plaintiff are clear." It should be noted in the instant case extensive hearings were held and it is clear that there is an urgent necessity to avoid injury which cannot be compensated for by damages. Additionally, the rights of plaintiff in this case are quite clear. A greater injury would result by refusing this request for preliminary injunction than by granting it.

We therefore enter the following

## ORDER

And now, June 29, 1981, after hearing on the above matter and submission of requested findings of fact and conclusions of law, it is hereby ordered and decreed that pending final disposition of the case and pending any further order of this court a preliminary injunction issue as follows:

(a) Dr. B. B. Franklin is enjoined and restrained from practicing medicine within a ten-mile radius of the Croydon Medical Center, 801 State Road, Croydon, Pa., 19020; and

(b) Dr. B. B. Franklin is enjoined and restrained from practicing medicine at the facilities occupied by the State Road Medical Center/State Road Medical Associates; and

(c) Dr. B. B. Franklin and his agents, servants, workmen and employes are enjoined and restrained from soliciting any person who was a patient treated at the Croydon Medical Center for the purpose of inducing any such person or persons to seek medical attention from Dr. B. B. Franklin.

This order shall become effective seven calendar days after plaintiff has posted a bond approved by the court in the amount of $45,000.